[No. 20277.   Department Two.   June 13, 1927.]

WILLIAM H. BRINKER, *as* *Trustee, Appellant,* v.
PEOPLES SAVINGS BANK, *Respondent.*[1]

[1] BILLS AND NOTES (6)—ACCEPTANCES—FAILURE OF FUND.  Accept-
ances of orders payable out of money due on a building contract
became a nullity when there was no money due when the ac-
ceptances matured.

[2] BANKRUPTCY (5)—CORPORATIONS (208) — INSOLVENCY — PREFER-
ENCES—TRUST FUND DOCTRINE.  There was no unlawful prefer-
ence to an insolvent contracting corporation, in violation of the
trust fund doctrine, by a bank's advancing funds to enable the
insolvent to complete a building, taking as security an equitable
assignment of the amounts due from the owner on the building
contract as the work progressed;~ and it is immaterial that
building bonds, secured by second mortgage on the building,
were substituted for the last of the money due on the building
contract; money advanced on the faith of such security going
to swell the assets of the insolvent, without any loss or detri-
ment to other creditors.

[3] CORPORATIONS (208)—INSOLVENCY — PREFERENCES — TRUST FUND
THEORY.  The substitution of a new security of an equal value
does not offend against the trust fund doctrine.

Appeal from a judgment of the superior court for
King county, Paul, J., entered July 2, 1925, upon
findings in favor of the defendant, in an action by a
trustee to recover assets of an insolvent corporation.
Affirmed.

*Hugh M. Caldwell, Robert H. Evans, Herr, Bayley
& Croson, Tucker, Hyland & Elvidge,* and *John P.
Lycette,* for appellant.

*Kerr, McCord & Ivey,* for respondent.

TOLMAN, J.—This action was instituted by the ap-
pellant, as trustee in bankruptcy of the Great Northern

[1]Reported in 256 Pac. 1025.

Construction Company, against the respondent, as defendant, to recover $47,000 in face value of second mortgage bonds, received and retained by the respondent, it is claimed, for a past consideration, the construction company being then insolvent, thus preferring the respondent, in violation of the trust fund doctrine.

The trial court denied a recovery, and the plaintiff has appealed.

The facts, while greatly involved, are, upon all points which we consider material, undisputed, and may be briefly summarized as follows: On April 5, 1923, the Great Northern Construction Company, hereinafter referred to as the "contractor," entered into a written contract with the Humphrey Investment Corporation, which will be referred to as the "owner," to construct an apartment house building in the city of Seattle. The contract price was $205,000, and the time and manner of payment is specified in the contract as follows:

"It is agreed that as full, complete and final payment for the work to be performed and the material and labor to be furnished by the contractor and in consideration of the covenants and agreements herein on the part of said contractor to be performed, the said contractor shall receive the sum of two hundred and five thousand dollars ($205,000) out of funds hereinafter referred to, subject to the additions and deductions as hereinbefore provided, in the following manner to wit:

"On the first day of each and every month the architect shall estimate the value of the labor and material incorporated in the work and upon the premises up to, but not including the first day of that month, and the architect shall give the contractor a certificate for the amount of said estimate, less the aggregate of previous payments, upon the mortgagees, payable out of the funds in their possession, hereinafter re-

ferred to.  On the completion of the entire work and the acceptance thereof of the building by the architect, the architect shall give the contractor a final certificate upon said mortgagees for the balance due under this contract.''

The contract then provides for the giving of a first mortgage for $140,000, and the giving of a second mortgage for $53,000 on the completion of the building, ''covering a loan of said amount,'' to be secured also by the assignment of the revenue of the building. Article XII of the contract reads:

''All payments due contractor under this contract shall be made on the first day of each month on architect's certificates given said contractor on said mortgagees.''

The only other reference to the time and manner of payment is:

''And it is further provided that the owner shall pay as a part of the contract price to the contractor upon the final execution of this agreement, the sum of six thousand ($6,000) dollars in cash, and the further sum of six thousand ($6,000) dollars to be paid upon the completion of the contract and the acceptance of the building by the owner.''

Shortly after the contract was executed, the contractor began borrowing money from the respondent. As each loan was made, the respondent took the contractor's note and an order on the owner for the amount, payable at a time certain, which order was accepted in writing by the owner.  The early orders seem to have been payable out of the proceeds of the first mortgage loan, but the later ones were made payable out of moneys due on the contract.  So far as they affect the questions here involved, the orders and acceptances are in substance the same, and we quote but one.

"October 31st, 1923
"Humphrey Investment Corporation
"Seattle.
"Gentlemen:
    "Re Building Contract N. W. Cor. Second & Blanchard:
    "You will please pay on Jan. 1st, 1924, to the Peoples Savings Bank of Seattle the sum of twenty-five thousand dollars ($25,000) out of money due on above contract.          Respectfully,
              "Great Northern Construction Co.,
              "by: A. Gerbel, Secy.      (Seal)
"Peoples Savings Bank
"Seattle.
"Gentlemen:
    "As per above order we will pay to you on Jan. 1st, 1924, the sum of twenty-five thousand dollars ($25,-000).          Humphrey Investment Corporation,
              "by: W. E. Humphrey, President.
                  "Alpheus Byers, Secretary.  (Seal)"

While the proceeds of the first mortgage lasted, these acceptances were paid according to their terms, but when that fund was exhausted, complications ensued. The second mortgage, when it was given, was given to secure bonds aggregating $53,000. It ran to a trustee, who was under no obligation to furnish the money, and while the building contract was silent upon the subject of whose duty it should be to sell the bonds so as to render their proceeds available for payments under the contract, the trial court received some testimony to the effect that the contractor agreed orally to accept that burden. But, at the same time, none of the bonds had been sold; in fact, they had not been issued, and could not be, under the terms of the contract, until the building was completed. As the building neared completion, the respondent found itself in possession of overdue notes secured by past due acceptances, in the sum of $47,000, with no money avail-

able from any source for the satisfaction of these obligations. With these conditions confronting them, the owner entered into a written agreement with the contractor, dated January 10, 1924, in which the following is incorporated:

"Whereas the said building is not yet completed in some details, but that it is necessary to procure funds for the payment of the balance of the unpaid bills for the construction of the said building, and the party of the first part hereto is willing to execute the said second mortgage for the said purpose, provided, however, that it is expressly agreed and understood that the making of this mortgage is not to be considered as an acceptance of the said building nor as any evidence thereof, and it is also expressly agreed and understood that the making of this mortgage does not waive or affect any rights of the said first party under the construction bond given by the said second party to the said first party for the performance of the building contract heretofore entered into between the parties hereto, . . ."

Thereafter the second mortgage was executed, the bonds were issued and validated, and $47,000 of them in face value were turned over to respondent, who thereupon satisfied the notes and acceptances for that amount, which it then held. The trial court found that, at the time respondent received these bonds, they were worth much less than their face; in fact, that the bonds so received were at the time not worth more than $30,000.

The building, while substantially completed by November 1, 1923, was not accepted by the owner until after the making of the written agreement last referred to. The contractor was financially embarrassed, and perhaps insolvent, as early as August 15, 1923, and was adjudged a bankrupt on March 12, 1924.

Appellant, in an exhaustive and elaborate brief,

presents many assignments of error, and advances a number of ingenious theories which are thought to be fatal to respondent's right to hold the bonds. It is utterly impossible, within any reasonable space, to set out and treat each of these matters intelligently, and at the risk of being charged with ignoring matters upon which a reversal is sought, we are forced to the unsatisfactory method of merely suggesting, as best we may, a few of the principal contentions made, and giving a general answer to all; but that does not mean that each theory has not been studied in detail.

[1] The first point going to the merits is that the bank had no lien, legal or equitable, upon the bonds. Much space is given to an elaborate argument on this point, the gist of it being that the acceptances calling for payment in money, the bank could demand money only. The owner was liable only for money due, and there being no money due when the acceptances matured, they became a nullity.

[2] The second point, based in large part upon the first, is that the owner held the bonds, when they were finally issued, in trust for the contractor's creditors, and an argument is advanced that the case falls within the rule announced in *Biddle Purchasing Co. v. Port Townsend Steel W. & Nail Co.*, 16 Wash. 681, 48 Pac. 407. Appellant, however, seems to have overlooked, or failed to accord due weight to, the basic fact in the *Biddle* case, that there was no mortgage executed when the loan was made, merely an understanding that, if the loan was not speedily repaid, security would be given, and that understanding was by the court held not definite or certain enough to be held to be a mortgage.

Nor was this a device to extend the life of an insolvent corporation, as was the case in *Thompson v.*

*Huron Lumber Co.*, 4 Wash. 600, 30 Pac. 741, 31 Pac. 25.

Another argument is based upon *McKnight v. Shadbolt*, 98 Wash. 665, 168 Pac. 473. But we can see no evidence here of one creditor paying another creditor with the assets of an insolvent corporation which were in his possession.

In his 281 pages of printed brief, appellant has developed numerous other arguments which it would be interesting to discuss, but, in the light of our previous decisions, such a discussion would lead to no practical result.

As we view the facts in the case, there is nothing here strange, unusual, or tending toward the obtaining of an undue advantage by one creditor over others. The contractor sought to borrow money from his bank to carry forward the work until funds should be available under the terms of the contract. The banker, having no statutory right of lien such as is enjoyed by the laborer and the materialman, demanded and obtained security before he parted with his money. By the orders and their acceptance, the contractor and the owner bound themselves to give to the bank that which the contractor would have received if he had been able to finance himself and had given no such orders. While the bank might have refused the bonds and demanded money, it was not bound to do so, and could waive its rights in that respect, since by doing so it obtained not more, but less, than was its due. The contract, by its terms, called for payments to the contractor in money as the work progressed; and when, by the acceptances, the contractor's right to receive the price fixed for the job passed to the bank, that constituted an equitable assignment of whatever commodity was substituted for the money. Perhaps the

bank might have complained of a secret oral agreement between the owner and the contractor to substitute bonds for money, but it did not see fit to do so, and certainly the contractor and his creditors were not injured by the bank's action in that respect.

It would appear that the case comes squarely within the exceptions to the trust fund doctrine pointed out and applied in *Terhune v. Weise,* 132 Wash. 208, 231 Pac. 954, 38 A. L. R. 94; *Hoppe v. First National Bank,* 137 Wash. 41, 241 Pac. 662, and *Smith v. National Bank of Commerce,* 142 Wash. 428, 253 Pac. 644. The funds advanced after the contractor became insolvent went to swell the contractor's assets. The advances were made on the faith and credit of the security then given; that security was the unpaid portion of the contract price, which was payable in money, and the taking of something of less value, substituted for money by the owner, was not in any wise prejudicial to creditors of the contractor. It seems unnecessary to determine whether such substitution was rightfully made by the owner, because, even so, the doctrine of equitable assignment would apply.

[3] There seems to be a contention that one of the notes which was surrendered when the bonds were delivered to the bank was a renewal of a prior loan of the same amount, and it is argued that the acceptance given to secure the renewal note was not based upon a present consideration. Even if the trial court was mistaken in finding against such renewal, the result must be the same, as the prior note, thought to have been so renewed, was at the time of its execution secured by a like acceptance, and that acceptance was surrendered with the note and a new one of the same date as the renewal note, but of the same value, force and effect, was accepted in lieu of the former. The substitution of a new security of an equal value does

not offend against the trust fund doctrine. *Lloyd v. Sichler,* 94 Wash. 611, 162 Pac. 979.

The judgment appealed from is affirmed.

MACKINTOSH, C. J., HOLCOMB, and MAIN, JJ., concur.